(55 South. 703.)

No. 18,564.

CARROLL, HENDERSON & CARROLL v. SWIFT & CO. et al.

(May 8, 1911. Rehearing Denied June 26, 1911.)

*(Syllabus by the Court.)*

SALES (§ 307*)—SALE OF SUGAR CANE—LIENS OF SELLER.

The purpose of Act 27 of 1894, entitled, "An act granting a lien and privilege in favor of vendors of sugar cane for the unpaid purchase price of said cane, or any part thereof, on all syrup, sugar, and molasses belonging to the purchaser of sugar cane and manufactured by him during the same season, so long as said syrup, sugar and molasses shall remain in the possession of said purchaser," was to give a lien and privilege upon a portion of the product of the cane upon the same terms and with the same effect as other liens are given upon entire crops; that is to say, as security for the whole debt and to be enforced, to the extent to which it is given, until the whole debt is paid, and a vendor of cane has his lien and privilege for the price against the property which is subject to it (being that portion of the products of the season which bear the same proportion to the entire product of the season as the cane sold by him, and unpaid for, bears to the entire quantity of cane manufactured), so long as he can find any part of that property in the possession of the purchaser, and any part of the price remains unpaid.

[Ed. Note.—For other cases, see Sales, Dec. Dig. § 307.*]

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Action by Carroll, Henderson & Carroll against Swift & Co. and others. The Henderson Bank intervenes. Judgment for plaintiff, and certain defendants and intervener appeal. Reversed and judgment rendered.

Robert J. Perkins, for appellant Henderson Bank. Benjamin Y. Wolf, for appellant Sal. Civarola. Hall, Monroe & Lemann, for other appellants. Carroll, Henderson & Carroll, pro se. Denegre & Blair, Henry H. Chaffe, Merrick & Lewis, R. H. Marr, Wm. A. Bell, Foster, Milling, Brian & Saal, and Dart, Kernan & Dart, for other appellees.

## Statement of the Case.

MONROE, J. This is a concursus of the creditors of Ellington Planting Company, Limited, a corporation which, being engaged in the business of sugar making both as planter and manufacturer, found itself at the end of the crop year 1907–08 unable to pay its debts, and, through its legal advisers, who appear herein as the titular plaintiffs (the creditors consenting), has deposited the proceeds of the third sugars in the registry of the court and cited the creditors who claim privileges thereon to appear and litigate their rights. The amount so deposited is $5,496.76, and the parties who have appeared to assert claims against it are as follows:

| | |
|---|---|
| Swift & Co. and Mrs. H. S. Crozier, claiming (together) a balance due, for cane sold by them.......... | $6,073 00 |
| Sal. Civarola, making a similar claim for ............................... | 998 52 |
| Higgins Oil & Fuel Company, oil for fuel ............................. | 4,687 10 |
| Texas Company, of Louisiana, oil for fuel ............................. | 833 09 |
| Louisiana Petroleum Company, oil for fuel.......................... | 1,300 31 |
| Star Lubricating Oil Company, lubricating oil..................... | 197 28 |
| J. Watts Kearney & Sons, sulphur and other sugar house supplies.... | 157 93 |
| Mente & Co., bags for marketing crop ............................. | 1,424 88 |
| Tutwiler Coal & Coke Company, Limited, coal for locomotive...... | 163 20 |
| West Kentucky Coal Company, coal for locomotive................... | 392 49 |
| Whitney-Central National Bank, cash furnished and used for making crop | 2,000 00 |

We find the following admission in the record:

"It is admitted that the deliveries of cane during the season of 1907–1908 [by Swift & Co. and Mrs. Crozier] were * * * 5,406 tons. It is further admitted that Louisa Plantation was the place on which the cane was grown for which Swift & Co. and Mrs. Crozier are now making claim, and that the cultivation of the place was carried on by them as a partnership. It is further admitted that the total purchase price due for said cane at the figures agreed upon between the seller and the purchaser was $17,084.81, plus an allowance for white cane of $368.79. It is further admitted that the total number of tons of cane ground by Ellington Planting Com-

pany during the season 1907–1908, constituting its crop made for that year, was 22,396 tons."

There is some difference of opinion as to whether the balance due Swift & Co. and Mrs. Crozier is $6,073 or $5,073.

It is further admitted, in effect, that the deliveries of cane by Sal. Civarola during the season in question were 1,117 tons, that the total purchase price due therefor was $3,479.79, and that the balance due him is $998.52.

It is further admitted as follows:

"There being no contest as to the amounts due and owing by the Ellington Planting Company, Limited, to the furnishers of supplies named in the petition filed herein for supplies furnished to said planting company for the season 1907–08, it is admitted that the amounts of said claims are as stated in the petition [being the amounts as herein above stated], * * * and that for said amounts all of the furnishers of supplies mentioned in said petition are entitled to the concurrent privilege granted them under article 3217 of the Revised Civil Code, subject only to whatever privilege may be legally accorded the vendors of cane during the season 1907–08, under Act 27 of 1894, * * * the controversy herein being solely as to the construction that should be placed upon the said Act 27 of 1894 and the resulting extent, if any, to which the said vendors of cane are entitled to a prior privilege on the fund herein deposited, on the facts to be established by them as to their claims on the trial of this case. It is also admitted that no part of the crop of 1907–08 remains in kind; that the funds herein deposited are the net proceeds of the third sugars of said crop, which proceeds, by consent of all parties, stand in lieu of said third sugars, subject to the privilege of all parties who would be entitled to a privilege on said third sugars in kind."

Mr. W. J. Barkley, who was secretary and treasurer of the Ellington Planting Company, explains the method by which as also the time when the price of the cane purchased by the company was fixed, as follows:

"The price that we paid for the cane was based upon the figures obtained from the secretary of the Louisiana Rice & Sugar Exchange, and this data was furnished to us weekly. We struck an average price for all cane that we received between the dates of delivery, * * * I mean the average price at which prime yellow clarified sugar sold for on the Louisiana Rice & Sugar Exchange between the dates of the delivery of the cane. You see the secretary of the Exchange furnishes all planters with weekly reports, and that is how we would get the figures to establish the average price on that cane. Some planters settled weekly; others, at the end of the crop. As I have told you before, you would take the price of the sugar on the Exchange and average that up between the dates of delivery of the cane, say from October 1st to January 10th, and, if it was then a question of either red or white cane, after we had gotten that average, we would multiply that by 85 cents or 90 cents, as the case might be, and would determine that way the value of the tonnage of cane, and it was, then, a question of easy figuring to get the total amount."

In order to make the foregoing explanation intelligible to the lay mind, it is proper to add that for every cent per pound shown to have been the average price at which prime yellow clarified sugar was quoted on the Exchange during the season Ellington Company at the end of the season paid 85 cents per ton for the red cane which had been delivered to it during the season, and 90 cents for the white cane which had been so delivered, and the average price of the sugar was obtained at the end of the season by adding and dividing the weekly quotations from the beginning of the season to the end. There were, however, no weekly settlements, nor was there any fixing of the price of cane or any way under the arrangement between the parties of fixing such price, as the cane was delivered for any particular lot of cane or for any particular week. In addition to the litigants who have been named, Henderson Barkley intervened in the case, and claims that he should be paid from the fund on hand by preference over the other claimants a balance of $1,450, alleged to be due him for salary at $300 per month as resident manager and overseer on Ellington Plantation for 13 months beginning January 1, 1907, and ending February 1, 1908.

### Opinion.

Act No. 89 of 1886, p. 127, provides:

"That all privileges and pledges on crops, granted by existing laws of this state, shall be ranked in the following order of preference, viz.:

"First, privilege of laborers; second, privilege of the lessor; third, privilege of the overseer; fourth, pledges under section 1 of Act No. 66 of 1874, in order of recordation; fifth, privileges of furnishers of supplies and of money, and of the physician."

Act No. 27 of 1894 provides:

"Section 1. * * * That, in addition to the privileges and remedies now accorded by law; hereafter, when any person shall sell sugar cane to any manufacturer of sugar within this state, which cane or any part thereof remains unpaid for, said vendor of said cane shall be entitled to have, maintain and enforce a lien and privilege for the amount of the unpaid purchase price or any portion thereof, on the syrup, sugar and molasses manufactured during the same season by the said purchaser, to the amount of the product of the cane so sold, which quantity is hereby fixed at that portion of the products of the season which bears the same proportion to the entire product of the season as the cane so sold and unpaid for bears to the entire quantity of cane manufactured during the said season, so long as said syrup, sugar and molasses remain in the possession and control of said manufacturer.

"Sec. 2. * * * That such lien and privilege shall be concurrent in favor of all unpaid vendors of sugar cane during the said season and shall rank second and after the privileges now accorded by law in favor of the laborers who assisted in manufacturing said sugar.

"Sec. 3. * * * That * * * all acts * * * in conflict with this act be * * * repealed."

As there are no laborers before the court, it follows from the statutes quoted, construed together, that the privilege of the cane vendors quoad the fund to be distributed is first in rank; and, as the aggregate amount of their claims exceeds that of the fund, it also follows that, if their privilege is good as against the entire fund, the other litigants can take nothing. The total amount of cane manufactured by Ellington Company during the season was 22,396 tons, and the total proceeds derived from the sale of the products was $118,362.17. Swift & Co. and Mrs. Crozier delivered 5,406 tons of the cane, or something over 24 per cent. at the price (fixed when the season was over for the whole upon the basis of so much a ton) of $17,453.60. That being the case, when the delivery was completed, and before any payment had been made on account, or any of the product had been sold, they were entitled, according to the statute, as we understand it, to a lien, ranking all others save those of the laborers and other vendors of cane upon that portion of the product which bore the same proportion to the entire product as the cane so delivered by them bore to the entire quantity of cane which had been manufactured. In other words, they had a lien for the whole amount due them on something over 24 per cent. of $118,362.17 worth of syrup, sugar, and molasses, and were entitled to enforce it against the property which was subject to it, to wit, (say) 24 per cent. of the product of the cane crop of 1907–08, so long as they could find any part of that property in the possession of Ellington Company, and any part of the debt remained unpaid.

"All that may be true," say the learned counsel for the furnishers of supplies, "but it is also true that, under the statute, as we understand it, in the ratio that the vendor of cane receives payment, on account of the debt due him, his security for the unpaid balance shrinks, so that, starting upon the basis of a lien upon 24 per cent. of the entire product of the crop of the season, resulting from his having supplied 24 per cent. of the cane from which that product was manufactured, if he receives payment on account to the extent of 75 per cent. of his claim, the unpaid for balance will represent only 6 per cent. of the total amount of cane manufactured during the season, and his lien will shrink in its application, and in such case will bear not on 24 per cent. of the entire product of the season, but only on 6 per cent. of so much of the entire product as he may find in the hands of the purchaser."

It would be hard to believe that any legislative body would undertake to establish a sliding scale security, such as that suggested, whereby the unpaid balance of a debt would become more and more insecure as payments

were made on account, and we are unable to concur in the view that the statute under consideration is susceptible of that interpretation. But, even if we were to concede (which we do not) that the words "cane sold and unpaid for," as used in the statute, mean specific stalks of a lot of cane which has been sold as a whole, we should be unable to follow the learned counsel in their attempt to reduce the proportion of the product to which such stalks would relate from a proportion of "the entire product of the season" to a proportion of so much of that product as might be left in the possession of the purchaser.

The lawmaker has said that the vendor of cane "shall have a lien * * * for the * * * unpaid purchase price of any portion thereof on the syrup, sugar and molasses, * * * to the amount of the product of the cane sold." No matter how large or how small a portion of his cane is unpaid for, therefore, he has his original lien for the price upon the product "to the amount" (and the whole amount) "of the product of the cane so sold." But the manufacturer buys cane from many persons, and raises it himself, and in the mill it all becomes common stock, so that it would be impossible to identify the product of the cane delivered by any particular person. The lawmaker therefore explains what he means in saying that each vendor of cane shall have a lien on the product "to the amount of the product of the cane sold" by saying:

"Which quantity (or amount) is hereby fixed as that portion of the products of the season which bears the same proportion to the entire product of the season as the cane so sold and unpaid for bears to the entire quantity of cane manufactured during said season."

But, let us suppose that Swift & Co. and Mrs. Crozier, who started out with the rights of vendors who had furnished 24 per cent. of all the cane manufactured by Ellington Company in 1907–08 have lost their position, and are reduced to the status of vendors who furnished only 6 per cent. of the cane manufactured, they would still be entitled to their lien upon "that portion of the products of the season which bears the same proportion to the entire product of the season," etc., or, in other words, they would be entitled to their lien on 6 per cent. of (say) $118,000 worth of syrup, sugar, and molasses, instead of on 6 per cent. of (say) 4½ per cent. of that amount. According to our reading of the statute, however, its purpose was to give the lien and privilege upon a portion of the product of the cane upon the same terms and with the same effect as, and that, other liens and privileges are given upon entire crops; that is to say, as a security for the whole debt and to be enforced upon the whole of the property affected and every part of it, until the whole debt is paid. As between Swift & Co. and Mrs. Crozier, on the one hand, and Civarola, on the other, their liens being concurrent, it seems advisable to determine the question of the balance due to the former; and, without entering into the details, we will say that we are of opinion that the $1,000, constituting the first item on the debit side of their account, was in our opinion as between them and Ellington Company properly charged to Louisa Plantation (though, as between Swift & Co. and Mrs. Crozier, it may be different), and hence that the balance due Swift & Co. and Mrs. Crozier is $5,073, whilst that due Civarola is $998.52. The conclusion thus reached renders it unnecessary that we should consider the claim of Mr. Barkley in detail, and we shall only say in regard to it that, though it may have been small, we think he disclosed sufficient interest in the fund on hand to entitle him to be relieved from the payment of costs.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside; and, proceeding to render such judgment as should have been rendered, it is

now adjudged and decreed that, after the payment therefrom of the costs of this litigation, including those of the appeal, the fund deposited by plaintiffs be divided between Swift & Co. and Mrs. Crozier, on the one hand, and Sal. Civarola, on the other, in the proportion of 83.56 per cent. to Swift & Co. and Mrs. H. S. Crozier and 16.44 per cent. to Civarola.